IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JUNE 1999 SESSION

FILED

July 9, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9809-CR-00374 |
| | ) | |
| | ) | Davidson County |
| v. | ) | |
| | ) | Honorable Cheryl Blackburn, Judge |
| | ) | |
| ERVIN LEE HAYES, | ) | (Attempted first degree murder, two counts) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

J. Michael Engle
Assistant Public Defender
1202 Stahlman Building
Nashville, TN 37201
(AT TRIAL)


Jeffrey A. DeVasher
Assistant Public Defender
1202 Stahlman Building
Nashville, TN 37201
(ON APPEAL)

For the Appellee:

Paul G. Summers
Attorney General of Tennessee
            and
Clinton J. Morgan
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493


Victor S. Johnson, III
District Attorney General
            and
Dan Hamm
Assistant District Attorney General
Washington Square, Suite 500
222 2nd Avenue North
Nashville, TN 37201-1649
            and
Sharon Brox
Assistant District Attorney General
Washington Square, Suite 500
222 2nd Avenue North
Nashville, TN 37201-1649

OPINION FILED:_____



AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Ervin Lee Hayes, appeals as of right from his convictions by a jury in the Davidson County Criminal Court for two counts of attempted first degree murder, a Class A felony. He was sentenced as a Range II, multiple offender to thirty-five years confinement in the custody of the Department of Correction for each count to be served consecutively. The defendant contends that (1) the evidence is insufficient to support his convictions, and (2) the trial court erred by imposing an excessive sentence and by ordering consecutive sentences. We affirm the judgments of conviction.

At trial, Tawanda Parker testified that she lived with her boyfriend, Andreal McLemore, in a duplex in Nashville. She testified that after midnight on December 12, 1996, the defendant and his girlfriend knocked on her door. She testified that she knew the defendant and that he had previously been to her apartment. She testified that the defendant entered and asked if he could borrow her car, to which she replied that the car was not working because the tailpipe had fallen off. She said the defendant responded, "[D]o you mean to tell me that damn car ain't working?" She said she told the defendant that it was not, then the defendant pulled out a handgun from his pocket and shot Mr. McLemore. She said the defendant then shot her in the left jaw, walked toward her and shot her again in the neck. She testified that before the defendant shot her and Mr. McLemore, she and the defendant had not been arguing but had been talking in a normal tone. She said the defendant did not say anything immediately before or after he shot them.

Ms. Parker testified that she and Mr. McLemore lay still until they heard the defendant leave. She said she crawled to the telephone to dial 9-1-1 but could not dial the numbers. She said she thought she was dialing 9-1-1, but an operator kept

2

coming on the line telling her to hang up and try again. She said she prayed and went to sleep. She said she awoke several times and tried to dial 9-1-1 but was unsuccessful. She said the next time she awoke, it was daylight. She stated that the telephone then rang, and she was able to answer it. She said it was a friend, and she told him to call the police because she had been shot. Ms. Parker testified that the police arrived shortly thereafter and that she told them that the defendant had shot them. She testified that a detective later showed her two photograph lineups. She testified that she did not see the defendant in the first lineup but that she identified him in the second one. She stated that she has been confined to a wheelchair since the shooting.

On cross-examination, Ms. Parker testified that she had known the defendant for about three months before the shooting. She stated that he lived with his mother down the street from her. She said that he had been at her house a couple of times on the day of the shooting to use her telephone. She testified that the defendant had previously bought a car and furniture from her. She said she had borrowed money from the defendant in the past but had always paid it back. She denied mentioning a robbery to one of the responding officers. She said that when the defendant was at her apartment, no one was angry, upset or yelling. She said she did not know why the defendant shot her.

Andreal McLemore testified that he had known the defendant about three months before the shooting and that the defendant had previously been in his and Ms. Parker's apartment. He said he was friendly with the defendant and never had any problems with him. He said that he was lying in bed when the defendant came to their apartment at about 12:30 a.m. on December 12. He said the defendant wanted to borrow Ms. Parker's car but could not do so because the tailpipe had fallen off. He said he heard the defendant and Ms. Parker talking but could not hear what they were

3

saying. He testified that he was sitting upright on the bed when the defendant shot him from about eight feet away. He said he had no conversation with the defendant before he was shot. He said the bullet struck his upper left neck, and he fell to the floor. He said that after he was shot, he heard two more shots, and Ms. Parker fell on top of him. He said that after the defendant left, Ms. Parker crawled to get the telephone but could not use it. He said they were not discovered until 1:30 p.m. the following day, and he said he was awake the entire time and was unable to move his lower body. He testified that he has been confined to a wheelchair since the shooting and that he has to live in a nursing home facility.

On cross-examination, Mr. McLemore admitted that he had served a three-year sentence for possession of cocaine in 1993. He said that neither he nor Ms. Parker had any dispute with the defendant.

Sergeant Gary Young testified that he was dispatched to the scene and discovered that the victims had been shot inside their apartment. He said he asked Ms. Parker who shot her, and she responded, "Ervin did it." On cross-examination, he testified that he did not know if the case was originally handled by a robbery unit, but he had called for a homicide unit.

Detective Frank Pierce testified that he works for the Homicide Unit and that when he arrived at the scene at about 1:30 p.m., the victims had already been transported to the hospital. He said he learned from another detective that the victims said that a man named Ervin had shot them. He said that Detective Dean Haney prepared a photograph lineup that did not contain the defendant's photograph. He said he showed the lineup to the victims, and they could not identify the defendant in the lineup. He said he prepared a second lineup containing the defendant's picture, and the victims were able to identify the defendant immediately.

4

On cross-examination, Detective Pierce testified that he did not preserve the first lineup. He said the photographs in the first lineup were selected by a computer based upon the information from the victims. He said he did not believe any written description of the defendant by the victims existed. On redirect examination, he testified that although he showed the first lineup to the victims, it was prepared by Detective Haney. He said that as far as he knew, the only information provided by the victims was the defendant's name.

Officer William Merrill of the Identification Division of the Metropolitan Police Department testified that he was in the area of the victims' apartment on December 12 and saw ambulances and police cars. He said that when he went inside the apartment, Ms. Parker was being treated and was unresponsive. He testified that Mr. McLemore was able to speak. He said he asked Mr. McLemore who shot him, and Mr. McLemore responded, "Ervin." Officer Merrill testified that he found blood in several areas, including on the bed, but that he did not find any shell casings, bullet holes or weapons at the scene.

Detective Dean Haney of the Armed Robbery Unit testified that he was dispatched to the scene on the report of a potential armed robbery. He said he arrived at about 2:00 p.m. He said that the Armed Robbery Unit was dispatched because Ms. Parker had mentioned robbery to an officer on the scene. He said he looked through the apartment, but it did not look as if anything had been taken. He said a billfold and pocketbook were still in the apartment. He testified that he saw Mr. McLemore at the hospital the next day and that he asked Mr. McLemore if he had been robbed. He said that Mr. McLemore was unable to speak but that he shook his head to indicate "no." He said Mr. McLemore shook is head to indicate "yes" when he asked if Ervin had shot him. Detective Haney testified that the case was then turned over to the Homicide Unit. He testified that he assisted Detective Pierce by generating a computer lineup based

5

upon the name "Ervin." He said he did not know whether the defendant was in the lineup, and he gave his paperwork to Detective Pierce. The jury convicted the defendant upon the foregoing evidence.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his convictions. He argues that no evidence exists to support a finding of premeditation necessary for an attempted first degree murder conviction. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A person commits the offense of criminal attempt when, "acting with the kind of culpability otherwise required for the offense [the person] . . . [i]ntentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be[.]" Tenn. Code Ann. § 39-12-101. First degree murder is the "premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1).

A premeditated act is one "done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to

6

the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). Furthermore, the element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

The defendant contends that the evidence is insufficient to support a finding of premeditation because no evidence of reflection or judgment exists. He argues that the evidence shows that he pulled out the gun and shot the victims. He claims that the evidence only supports a conviction for attempted second degree murder. We disagree.

We believe that the facts in the light most favorable to the state support the jury's finding of premeditation. The defendant entered the victims' apartment armed with a loaded weapon. He calmly took the weapon out of his pocket and, without warning or provocation, shot Mr. McLemore, who was unarmed. He then turned the gun upon Ms. Parker, also unarmed, and shot her without warning. He then walked toward Ms. Parker and shot her again. The defendant then left the apartment, without comment, leaving the injured victims alone. The defendant's advance procurement of a weapon, his use of that weapon on two unarmed victims, his calmness immediately after the shooting, and the cruelty of leaving the injured victims to their fate supports a finding of premeditation.

7

## II. SENTENCING

The defendant contends that the trial court erred in sentencing. He argues that (1) his sentences are excessive because the trial court misapplied an enhancement factor, and (2) consecutive sentences are not warranted. The state contends that the defendant's sentences are appropriate. We agree.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1995).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the

8

principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class A felony is presumptively the midpoint in the range when there are no enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

A presentence report was introduced at the sentencing hearing. It reflects that the defendant was twenty-seven years old at the time of sentencing and had no mental or physical health problems. It reflects that the defendant has previous convictions for voluntary manslaughter and aggravated assault in 1993, possession of cocaine in 1992, and assault with the intent to commit armed robbery in 1990. The report shows that the defendant completed no education beyond the seventh grade and reported no employment history.

The trial court found the following enhancement factors applicable, as listed in Tenn. Code Ann. § 40-35-114:

9

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(5) The defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense;

(6) The personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great;

(8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;

(9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense; [and]

(11) The felony resulted in death or bodily injury or involved the threat of death or bodily injury to another person and the defendant has previously been convicted of a felony that resulted in death or bodily injury[.]

The trial court found no applicable mitigating factors and sentenced the defendant as a Range II, multiple offender to thirty-five years for each conviction, to be served consecutively. In ordering consecutive sentences, the trial court found that the defendant has an extensive record of criminal activity and is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(2), (4). The trial court also determined that consecutive sentences reasonably relate to the severity of the offenses and are necessary to protect the public from further criminal activity by the defendant. State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

### A. LENGTH OF SENTENCE

First, the defendant contends that the trial court erred by applying enhancement factor (5), that he treated or allowed the victims to be treated with

exceptional cruelty during the commission of the offense.  The trial court applied enhancement factor (5) based upon the cruelty of the unprovoked shooting and the fact that the defendant left the injured but conscious victims in their apartment, and they were not found until the next day.  In applying factor (5) based upon the cruelty of the unprovoked shooting, the trial court relied upon this court's opinion in State v. Terry Antonio Lawrence, No. 01C01-9603-CR-00122, Davidson County (Tenn. Crim. App. Sep. 19, 1997).  In that case, a panel of this court held that factor (5) was applicable to enhance the defendant's attempted first degree murder conviction.  The panel concluded that "[t]he unarmed victim offered no resistance . . . . However, the defendant's response to the victim's compliance was to shoot him at close range in the face.  The trial court was correct in finding this to be an act of exceptional cruelty." Terry Antonio Lawrence, slip op. at 7.

Initially, we note that the application of factor (5) requires "exceptional cruelty," which is usually found in cases of abuse or torture.  See State v. Williams, 920 S.W.2d 247, 250 (Tenn. Crim. App. 1995).  Our supreme court has held that the facts must "support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the crime.  State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (quoting State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)).

In Poole, the supreme court concluded that knocking the victim unconscious and leaving her on the floor bleeding under circumstances making it unlikely that she would soon be discovered or receive treatment demonstrated a greater culpability than that needed for the commission of the especially aggravated robbery for which the defendant was convicted.  945 S.W.2d at 99.  In this regard, though, a distinction exists in the present case because the offense is the attempt to commit first degree murder.  A rational argument can be made that a person who simply enters a

11

victim's home, shoots the victim with the intent to kill the victim, and then leaves the home does not necessarily have greater culpability through exceptional cruelty if the victim survives, although left alone. In any event, we believe that the remaining factors adequately support the sentences imposed.

## B. MANNER OF SERVICE

Next, the defendant contends that the trial court erred by imposing consecutive sentencing. He does not contest the trial court's findings with respect to Tenn. Code Ann. § 40-35-115 but asserts that consecutive sentences do not reasonably relate to the severity of the offenses and are not necessary to protect the public. See Wilkerson, 905 S.W.2d at 938.

We conclude that the record supports the trial court's imposition of consecutive sentencing. The consecutive sentences in the present case reasonably relate to the severity of the offenses and are necessary to protect the public. The defendant, without provocation or warning and for no apparent reason, shot Mr. McLemore in the neck and shot Ms. Parker twice in the jaw and neck, leaving the unarmed and helpless victims lying on the floor. Both victims suffered serious injuries and are confined to wheelchairs as a result of the shooting. Furthermore, the defendant's criminal record reflects three previous convictions involving physical violence or death. These facts support consecutive sentencing.

In consideration of the foregoing and the record as a whole, we affirm the judgments of conviction.

_____
Joseph M. Tipton, Judge

12

CONCUR:

_____
Joe G. Riley, Judge


_____
Alan E. Glenn, Judge